# EXHIBIT P

Page 1

```
 1                                    VOLUME: I
                                      PAGES: 120
 2                                    EXHIBITS: PER
                                               INDEX
 3         UNITED STATES DISTRICT COURT
                    FOR THE
 4         DISTRICT OF MASSACHUSETTS

 5
 6    -----------------------------
      LIBERTY MUTUAL INSURANCE
 7    COMPANY,
                  Plaintiff
 8    -vs-
                                      CIVIL ACTION
 9    THE BLACK & DECKER CORPORATION, NO. 96-10804-DPW
      BLACK & DECKER, INC., BLACK &
10    DECKER (U.S.) INC., EMHART
      CORPORATION, and EMHART
11    INDUSTRIES, INC.,
                  Defendants
12    -----------------------------

13         DEPOSITION of CLAYTON ROOP, a witness

14    called on behalf of the Plaintiff, pursuant to the

15    Federal Rules of Civil Procedure, by and before

16    Mona M. LaRiviere, Notary Public and Registered

17    Professional Reporter within and for the Commonwealth

18    of Massachusetts, at the offices of Holland & Knight,

19    LLP, 10 St. James Avenue, Boston, MA, on Tuesday,

20    April 3, 2001, commencing at 11:05 a.m.

21
22              Hennessey Corp., d/b/a
                  ROBERT H. LANGE CO.
23                50 Congress Street
                  Boston, MA  02109
24                  (617) 523-1874
```

Page 2

```
 1    APPEARANCES:

 2         HOLLAND & KNIGHT, LLP

           (by Peter J. Duffy, Esq.)

 3         10 St. James Avenue

           Boston, MA

 4              on behalf of the Plaintiff;

 5         WILLCOX, PIROZZOLO & McCARTHY

           (by Jack R. Pirozzolo, Esq.)

 6         50 Federal Street

           Boston, MA  02110

 7              on behalf of the Defendants.

 8
```

Page 3

```
 1                  _I_N_D_E_X_
      WITNESS NAME                              PAGE NO.
 2
      CLAYTON ROOP
 3      Direct by Mr. Duffy                        4

 4                  _E_X_H_I_B_I_T_S_

 5    EXHIBIT NO.                                PAGE NO.

 6    1   Affidavit of Clayton Roop dated
          February 4, 1998                          26
 7
      2   Affidavit of Clayton Roop dated
 8        January 1999                              44

 9    3   Affidavit of Alan Schlemmer               74

10    4   Affidavit of Richard T. Kidwell dated
          January 6, 1999                           80
11
      5   Letter dated August 5, 1992 from Linda
12        McCroddan to Alan Schlemmer               83

13    6   Letter dated September 29, 1994 from Gary
          Duvall to Elaine Caprio-Brady            107
```

Page 4

1   STIPULATIONS
2       It is hereby stipulated by and
3   between the respective parties that the witness
4   shall read and sign the deposition transcript
5   within 30 days of receipt. The filing and
6   notarization are waived.
7       It is further stipulated and agreed
8   that all objections except as to the form of the
9   question and motions to strike shall be reserved
10  until the time of trial.
11      CLAYTON ROOP, having been duly
12  sworn, testified upon his oath in answer to
13  interrogatories as follows:
14          DIRECT EXAMINATION
15  BY MR. DUFFY:
16  Q  Mr. Roop, did you prepare for the deposition
17     here today by reviewing any documents?
18  A  Yes, I did.
19  Q  What documents did you review?
20  A  My previous deposition, Mr. Schlemmer's
21     deposition, Kidwell and Sweeney, and I met with
22     Jack this morning.
23  Q  Why did you review the depositions?
24  A  Refresh my memory.

Page 49

1  is that this case was referred to ESIS pursuant
2  to the written contract that you've had since
3  '85-'86; is that right? There was no separate
4  retention in other words?
5  A  Correct.
6  Q  Was ESIS also the claims administrator for the
7     Hand-Arm Vibration claim; that is, the
8     Mississippi Hand-Arm Vibration claim, in the
9     Arkansas Hearing Loss claim as well?
10 A  Yes. I'm not sure of the Arkansas. Depending
11    on what years were involved, it could have been
12    Aetna.
13 Q  Just so I'm clear, Aetna has also acted as a
14    claims administrator for --
15 A  For Emhart.
16 Q  Emhart. Now, I note in the next sentence it
17    indicates "In its capacity as claims
18    administrator, ESIS received certain invoices in
19    connection with the defense of the Mississippi
20    Hearing Loss claim, primarily from Black &
21    Decker's local counsel." Do you see that?
22 A  Yes.
23 Q  Now, it indicates primarily from Black &
24    Decker's local counsel. Was ESIS provided any

Page 50

1     other invoices?
2  A  There may have been some of Miles' invoices that
3     they were provided.
4  Q  Do you have any record or does Black & Decker
5     have any record of what invoices ESIS was
6     provided?
7  A  We have a record of what they paid.
8  Q  But no record of what invoices they were
9     provided?
10 A  No.
11 Q  Other than local counsel invoices and possibly
12    some Miles & Stockbridge invoices as well, was
13    ESIS provided any other invoices that you know
14    of in connection with the Mississippi Hearing
15    Loss?
16 A  If there were expenses other than, you know,
17    counsel fees, ESIS would have paid those.
18 Q  But you have no way of knowing whether there
19    were any other such invoices?
20 A  Only what was paid.
21 Q  So, you only know the bottom-line dollar amount
22    of what was paid by ESIS, but you don't know
23    specifically the line items that were paid?
24 A  Oh, I knew -- I could -- yeah, the data base has

Page 51

1     the line items in it.
2  Q  Just so I'm clear, then, the ESIS record would
3     contain what invoices were paid out by ESIS and
4     to whom?
5  A  Yes.
6  Q  Going on in that same sentence, it indicates
7     that ESIS paid those invoices and sought
8     reimbursement of portions of those invoices from
9     Black & Decker's insurers; do you see that?
10 A  Yes.
11 Q  Why did ESIS only request or seek reimbursement
12    of portions of the invoices and not the whole
13    entirety of the invoices?
14 A  Well, they got a portion of the invoices from
15    the carriers they thought were involved.
16 Q  Why didn't they seek the entire amount from the
17    carriers they thought were involved? Why did
18    they seek only portions from the carriers
19    involved?
20 A  Well, I think in total they tried to collect it
21    all.
22 Q  What's the basis for your assertion that they
23    tried to collect it all?
24 A  Well, there are exhibits back here, I don't know

Page 52

1     what -- what they are, B, C and D I believe,
2     where they sent out -- they say they sent out,
3     tried to collect the numbers.
4  Q  Well, let's go on to the next paragraph --
5  A  All right.
6  Q  -- where it indicates that in a letter from
7     Linda McCrondan (sic), or McCroddan, of ESIS
8     dated September 4, 1992, and that's attached,
9     ESIS requested reimbursement from Black &
10    Decker's insurers for payments that ESIS had
11    made for defense costs in the Mississippi
12    Hearing Loss claims through September 4, 1992 as
13    follows, and then you provide the breakdown,
14    which indicates Liberty Mutual 37.5 percent,
15    Home Insurance 12.5 percent, London insurers
16    12.5 percent, and Twin Cities 4 percent; do you
17    see all that?
18 A  Yeah.
19 Q  Now, when I add that up, that provides a total
20    of I believe 65 percent --
21 A  Uh-huh.
22 Q  -- of the total payment that ESIS had made for
23    defense costs. So, that indicates that ESIS did
24    not request one hundred percent from the

Page 73

1  A  He would have conferred probably with me.
2  Q  I note the last sentence, even the last clause
3     of the first paragraph indicated "That since
4     signatures on the Cost-Sharing Agreement could
5     be obtained simply through the mail..." Do you
6     see that?
7  A  Yes.
8  Q  Do you know what the Cost-Sharing Agreement
9     reference there is?
10 A  There are references in here to a Cost-Sharing
11    Agreement somewhere -- oh, they're in
12    Mr. Shemer's (sic) deposition.
13        MR. PIROZZOLO: Schlemmer.
14 A  Schlemmer.
15 Q  Is it your understanding that the same
16    Cost-Sharing Agreement referenced by Mr.
17    Schlemmer is the Cost-Sharing Agreement
18    referenced here by ESIS?
19 A  It is sent to him, and I don't know that that's
20    exactly what Linda is referring to. It would be
21    speculation on my part.
22 Q  Referring to the third paragraph --
23 A  Yes.
24 Q  -- indicating "The original agreement is

Page 74

1     enclosed in Alan Schlemmer's letters and I ask
2     that an authorized representative of his company
3     sign the agreement and forward it to Jeannie for
4     signature" do you see that?
5  A  Yes.
6  Q  And then later on it indicates "After all
7     signatures are obtained, I will distribute
8     copies." Do you see that?
9  A  Yes.
10 Q  Are you aware of any Cost-Sharing Agreement that
11    was being circulated amongst the parties to this
12    letter at or about September 4th, 1992?
13        MR. PIROZZOLO: Objection.
14 A  Only the one that's in Mr. Schlemmer's
15    deposition.
16        THE WITNESS: Is that a deposition
17    or affidavit?
18        MR. PIROZZOLO: Affidavit.
19 A  Affidavit.
20 Q  I have a copy of Mr. Schlemmer's affidavit that
21    I believe you're referencing that I ask the
22    reporter to mark as Roop Exhibit No. 3.
23        (Document marked Exhibit No. 3.)
24    BY MR. DUFFY:

Page 75

1  Q  Referring you to tab D of the Schlemmer
2     affidavit, Roop No. 3, is the Interim
3     Cost-Sharing Agreement for Mississippi Hearing
4     Loss litigation, at that tab D the Cost-Sharing
5     Agreement that you were aware of being
6     circulated amongst the parties to the September
7     4, 1992 letter?
8  A  I believe this is the one that would have been
9     referred to.
10 Q  Have you seen that Interim Cost-Sharing
11    Agreement attached at tab D before?
12 A  Before what?
13 Q  Before today.
14 A  I probably did, yes.
15 Q  And when would you --
16 A  I don't --
17 Q  -- have seen it?
18 A  I don't -- back in '92-'93 sometime probably.
19 Q  How did you come about seeing it back in
20    '92-'93, that is, the Cost-Sharing Agreement?
21 A  Mr. Kidwell would have shown it to me.
22 Q  And did you review it at that time?
23 A  I don't know to what extent we reviewed it,
24    because it was his recommendation not to sign

Page 76

1     it.
2  Q  When did Mr. Kidwell recommend that you not sign
3     the agreement?
4  A  I don't know exactly.
5  Q  What did Mr. Kidwell say specifically?
6  A  I don't know that.
7  Q  Where did Mr. Kidwell say that you should not
8     sign it?
9  A  I never saw him in his office, so I'd have to
10    assume it was in my office.
11 Q  So you were sitting face to face with
12    Mr. Kidwell when he told you not to sign this
13    agreement?
14 A  Probably, yes.
15 Q  But you can't --
16 A  I can't say specifically.
17 Q  Do you recall what Mr. Kidwell said regarding
18    the agreement?
19        MR. PIROZZOLO: I don't mind Mr.
20    Roop answering these questions, but I have to
21    argue privilege. It slipped out, what
22    Mr. Kidwell said, before I had a chance to
23    instruct.
24        MR. DUFFY: The reporter is having

Page 85

1 particular date it was, I don't know.
2 Q And who else was present?
3 A If she walked in this room I wouldn't know her.
4 Q Earlier in your deposition you indicated that
5   you were at the original meeting where the cost
6   sharings were discussed; do you recall that?
7 A Yes.
8 Q When was that meeting?
9 A I don't recall.
10 Q Is that the same meeting that you believe Linda
11   McCroddan may have been present at?
12       MR. PIROZZOLO: Objection.
13 A Restate the question.
14       (THEREUPON, the requested portion
15   of the text was read by the Court Stenographer.)
16 A The meeting you're referring to there?
17 Q Do you believe Linda McCroddan may have been
18   present at the original meeting where cost
19   sharings --
20 A Yes.
21 Q -- were discussed?
22 A I believe she was.
23 Q Do you recall any other people who were present
24   or who may have been present for that meeting?

Page 86

1 A Mr. Kidwell and myself, and I believe there was
2   a representative from Liberty, and from Mendes &
3   Mount, which would have been Ed Man -- his
4   name's in here somewhere.
5 Q And where was that meeting?
6 A Philadelphia.
7 Q What was the purpose of that meeting?
8 A To get the insurance companies to pay their cost
9   of this litigation.
10 Q And what did you say during that meeting?
11 A I don't recall.
12 Q What did Mr. Kidwell say during that meeting?
13 A I don't recall.
14 Q What did the person from Mendes & Mount say
15   during --
16 A I don't know.
17 Q What did the person from Liberty Mutual say
18   during the meeting?
19 A I don't know, don't recall.
20 Q Can you recall anything at all said during that
21   meeting in Philadelphia?
22 A No. Sorry.
23 Q I note in paragraph 4 of Mr. Kidwell's
24   affidavit --

Page 87

1 A Paragraph 4?
2 Q Yes, sir.
3 A Uh-huh.
4 Q It indicates, "I was not authorized on behalf of
5   Black & Decker to enter into a Cost-Sharing
6   Agreement of the type mentioned in the Schlemmer
7   affidavit." Do you see that?
8 A Yes.
9 Q Was Mr. Kidwell authorized to enter into any
10   type of Cost-Sharing Agreement on behalf of
11   Black & Decker?
12 A No.
13 Q Were you authorized to enter into a Cost-Sharing
14   Agreement on behalf of Black & Decker?
15 A At that time, no.
16 Q Was anyone within the company authorized to
17   enter into a Cost-Sharing Agreement?
18 A Yes.
19 Q Who?
20 A Would have been an officer, a treasurer who I
21   reported to.
22 Q And who specifically would that have been at
23   this time?
24 A A Mr. Page.

Page 88

1 Q Did you ever discuss the Interim Cost-Sharing
2   Agreement with Mr. Page?
3 A I don't recall.
4 Q What is Mr. Page's first name?
5 A Steven.
6 Q Do you know where Mr. Steven Page is today?
7 A Yes.
8 Q Where?
9 A He is president of Otis Elevator, which is part
10   of United Technologies.
11 Q Do you know whether Mr. Kidwell had any
12   conversations with Mr. Page?
13 A I don't recall.
14 Q Who executed the contract between Black & Decker
15   and ESIS?
16 A Who executed it?
17 Q Yes. Who signed it on behalf of Black & Decker?
18 A I did.
19       (Attorney and client conferring.)
20 Q I note --
21 A Yeah, in the first couple years -- we started
22   with them in '85 -- it probably was a Mr. Ortel
23   that signed it. O-R-T-E-L.
24 Q Okay.

Page 89

1  A  Who would have signed it, and I would have
2     signed it as an -- it's an annual deal, so I
3     would have signed it after '90.
4  Q  Sir, referring you to the third sentence of this
5     letter that you got, it indicates "You will note
6     Black & Decker has agreed..." --
7         MR. PIROZZOLO: Which one are you
8     referring to, Exhibit 4?
9         THE WITNESS: Exhibit 5.
10 Q  Yes, referring you to the August 5th, 1992
11    letter, Exhibit 5, and specifically the third
12    sentence, "You will note Black & Decker has
13    agreed to consider itself self insured for the
14    period of 1964 to 1970 since specific coverage
15    information has not been located to date"; do
16    you see that?
17 A  Yes.
18 Q  Following your receipt of this letter, did you
19    ever indicate to anyone that Black & Decker had
20    not agreed to consider itself insured for that
21    period?
22 A  I don't -- I don't recall whether it did or
23    didn't.
24 Q  Did you ever take issue with this language in

Page 90

1     this letter by ESIS on August 5th, 1992?
2  A  I don't recall.
3  Q  Do you know whether anyone --
4  A  This is not a letter by ESIS.
5  Q  Who is it a letter by then, sir?
6  A  Alan Schlemmer of Liberty.
7  Q  Isn't it a letter to Alan Schlemmer, sir, and a
8     letter from ESIS?
9  A  Oh, yes. I'm sorry. It is, yeah. Yes.
10 Q  Did you ever inform Alan Schlemmer or anyone at
11    Liberty that Black & Decker had not agreed to
12    consider itself self insured for the period of
13    1964 to 1970?
14 A  Well, I'll answer by saying, it was never an
15    issue with us that we were anything but insured
16    by Liberty.
17 Q  For purposes of allocating percentage shares of
18    responsibility for cost sharing in the
19    Mississippi Hearing Loss litigation, did you
20    ever tell anyone at Liberty Mutual that Black &
21    Decker would not agree to consider itself self
22    insured for the period 1964 to 1970 following
23    this August 5th, 1992 letter?
24 A  I don't recall whether we did or didn't.

Page 91

1  Q  Sir, referring you back to your affidavit that
2     was marked as Exhibit No. 2, and specifically
3     referring you to tab C, it's the letter dated
4     June 18, 1993.
5  A  Uh-huh.
6  Q  Where did you obtain this letter from to attach
7     it to your affidavit?
8  A  I don't know where.
9  Q  Is it safe to say that this letter came from
10    your files?
11 A  It could have, but I was not copied on the
12    letter.
13 Q  I note the last sentence before the chart
14    portion on the first page of the letter
15    indicating, "According to our Cost-Sharing
16    Agreement, each carrier owes the following." Do
17    you see that?
18 A  Yes.
19 Q  Do you know what the Cost-Sharing Agreement
20    referenced there is?
21 A  I can only assume she's referring to the one
22    that Alan had.
23 Q  And she is an agent of Black & Decker; is that
24    right?

Page 92

1  A  She had no authority to enter into an agreement
2     with black -- for Black & Decker.
3  Q  What is the basis for your assertion in that
4     regard?
5  A  We didn't give her any authority to enter into
6     any agreement.
7  Q  What authority did you give her?
8  A  She had specific instructions of how to handle
9     particular claims.
10 Q  What were her specific instructions as to how to
11    handle particular claims?
12 A  Well, they were spelled out in a -- in a Service
13    Agreement.
14 Q  Has that Service Agreement been produced in this
15    litigation?
16 A  I don't know.
17 Q  Is that the same contract that we discussed
18    earlier?
19 A  Yes.
20 Q  The one that Ortel signed originally and you
21    began to sign after a certain period, 1990 or
22    so?
23 A  Yes.
24 Q  And renewed on an annual basis?

**Page 97**

1 see that?
2 A Yes.
3 Q Did you have any discussions or meeting with any
4   of Black & Decker's carriers with respect to
5   cost sharing on the vibration claims?
6 A No.
7 Q Just so I'm clear, then, the Philadelphia
8   meeting we discussed earlier concerned only the
9   Mississippi Hearing Loss; is that correct?
10 A Yes.
11 Q Do you know whether ESIS ever received word from
12   Black & Decker's corporate counsel, Miles &
13   Stockbridge, on the cost sharing arrangement for
14   the vibration claims?
15 A No, I don't.
16 Q Let me ask you this, Mr. Roop, if there was no
17   Cost-Sharing Agreement between the parties, why
18   is it, then, that ESIS was not billing Black &
19   Decker's insurance carriers for one hundred
20   percent of the cost of the Mississippi Hearing
21   Loss litigation?
22         MR. PIROZZOLO: Objection.
23 A I believe that Liberty was taking the position
24   that it was only responsible for a portion of

**Page 98**

1   the -- of the loss on our -- and not the full
2   responsibility was theirs.
3 Q And so ESIS, is it your understanding, simply
4   went along with Liberty's position and only
5   billed it for a portion?
6 A At that time, yes.
7 Q You indicated "At that time." Has ESIS ever
8   billed Liberty for more than a portion?
9 A Not that I'm aware of.
10 Q Is it fair to say, then, that ESIS was
11   proceeding under the assumption that there was a
12   Cost-Sharing Agreement for the Mississippi
13   Hearing Loss litigation?
14         MR. PIROZZOLO: Objection.
15 Q Do you have any documents or other information
16   to suggest that ESIS was acting under anything
17   else other than the assumption that the
18   Cost-Sharing Agreement was effective?
19         MR. PIROZZOLO: Objection.
20 A They were probably operating under the
21   assumption that it would be executed, but it was
22   never executed.
23 Q And was Black & Decker also operating under the
24   understanding that the Cost-Sharing Agreement

**Page 99**

1   for the Mississippi Hearing Loss litigation
2   would be executed?
3         MR. PIROZZOLO: Objection.
4 A Being as nobody -- I did not have the authority
5   to sign a document like that, I can't say
6   whether we would have eventually signed it.
7   Certainly would not have signed it without the
8   years in question.
9 Q Do we have any documents or information to
10   suggest that Miles & Stockbridge was acting
11   under any understanding other than that the
12   Cost-Sharing Agreement for the Mississippi
13   Hearing Loss litigation was effective?
14         MR. PIROZZOLO: Objection.
15 A Say that again. I'm not so sure whether the
16   answer, right answer is yes or no because of the
17   way you worded the question.
18 Q Is it your understanding that Miles &
19   Stockbridge was operating under the
20   understanding that the Cost-Sharing Agreement
21   was effective?
22         MR. PIROZZOLO: Objection.
23 A They were not operating under the assumption
24   that the cost agreement was effective.

**Page 100**

1 Q And what is the basis for your assertion in that
2   regard? Because we've just seen documents where
3   attorneys at -- well, we have just seen a
4   document where there was reference to the
5   Cost-Sharing Agreement by Miles Stockbridge.
6         MR. PIROZZOLO: Objection.
7 Q You can answer.
8         MR. PIROZZOLO: Which document?
9   Which document? I don't know what document
10   you're referring to.
11         (Short pause.)
12         MR. PIROZZOLO: Care to rephrase
13   your question?
14         MR. DUFFY: Let's stay off for a
15   moment, Jack.
16         (THEREUPON, there was a discussion
17   off the record, after which the following
18   proceedings were had.)
19         MR. DUFFY: Back on. Jack, you're
20   right. Actually, it was ESIS.
21 BY MR. DUFFY:
22 Q Is it your understanding that ESIS was operating
23   under the understanding the Cost-Sharing
24   Agreement was effective?

### Page 101

1    MR. PIROZZOLO: Objection.
2  Q  Because we've seen the documents.
3  A  I think they thought plenty of times it was not
4    signed and executed so, therefore, it couldn't
5    be effective.
6  Q  Where has ESIS said that it was not signed and
7    executed and could not, therefore, be effective?
8  A  Okay. But could not be effective because my --
9    they didn't say that. They state at various
10    times that it was not executed and signed by
11    both parties.
12  Q  Did they ever say this to you personally?
13  A  I don't recall.
14        MR. DUFFY: Can we take a quick
15    break now?
16        MR. PIROZZOLO: Sure.
17        (THEREUPON, there was a recess
18    taken, after which the following proceedings
19    were had.)
20  BY MR. DUFFY:
21  Q  Referring you to paragraph 16 of your second
22    affidavit, Mr. Roop. It's the Exhibit No. 2.
23        MR. PIROZZOLO: Paragraph 16? I
24    just didn't hear.

### Page 102

1        MR. DUFFY: Exhibit -- paragraph 16
2    of Exhibit 2.
3        MR. PIROZZOLO: Thank you.
4  Q  It indicates that ESIS also paid invoices for
5    defense costs that Black & Decker incurred in
6    the Mississippi Hand-Arm Vibration claim; and
7    then it goes on to indicate, "The business
8    records that I have reviewed indicate that ESIS
9    did not seek reimbursement for defense costs in
10    the Mississippi Hand-Arm Vibration claim from
11    any of Black & Decker's insurers." Do you see
12    that?
13  A  Uh-huh.
14  Q  Do you know why it is that ESIS did not seek
15    reimbursement defense costs from Black & Decker
16    insurers in the Hand-Arm Vibration claims?
17  A  Well, there was not an interim agreement for
18    that, so I would assume that's the reason
19    they didn't.
20  Q  Was there an interim agreement with respect to
21    the Mississippi Hearing Loss claims? Because I
22    understood your position was that there was no
23    such agreement.
24  A  Well, there's a draft of an agreement called

### Page 103

1    "Interim Cost-Sharing Agreement, Mississippi
2    Hearing," that's what Mr. Schlemmer says.
3  Q  And you believe the existence of that document,
4    which is Exhibit D to the Schlemmer affidavit,
5    accounts for the reason why ESIS submitted the
6    Mississippi Hearing Loss invoices for
7    reimbursement but not the Mississippi Hand-Arm
8    Vibration invoices?
9  A  They're two different cases.
10  Q  Did Black & Decker ever request that its
11    insurers reimburse the cost of the Mississippi
12    Hand-Arm Vibration claim?
13  A  Not that I'm aware of.
14  Q  With respect to paragraph 21 of your affidavit,
15    Exhibit No. 2, and specifically the second
16    sentence there, and we're moving on to the
17    Arkansas Hearing Loss claim, you indicate,
18    "During the course of the Arkansas Hearing Loss
19    claim there was an arrangement to pay for
20    defense costs among Farrel's insurers that is
21    set forth in a March 15, 1993 letter"; do you
22    see that?
23  A  Yes.
24  Q  Was there any similar arrangement in the

### Page 104

1    Mississippi Hearing Loss claim that you were
2    aware of?
3  A  Restate your question again.
4  Q  Let me put it this way, sir -- actually, let's
5    flip to the letter, the letter referenced there.
6    It's tab G of your Exhibit No. 2.
7  A  Yeah.
8  Q  It's the March 15, 1993 letter to Black & Decker
9    from Delores Ladd; do you see that?
10  A  Which schedule is that?
11  Q  G.
12  A  From Delores Ladd, yes.
13  Q  Who is Delores Ladd?
14  A  Delores Ladd is an employee of ESIS. I believe
15    she's in -- was in Dallas or Houston or
16    somewhere in Texas.
17  Q  Now, you indicate that this is an arrangement
18    for payment of defense costs among Farrel's
19    insurers; is that right?
20  A  In response --
21  Q  In paragraph 21?
22  A  Uh-huh.
23        MR. DUFFY: Did you get the Uh-huh?
24        THE WITNESS: I'll give you a yes