UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


LIBERTY MUTUAL INSURANCE CO., )
                              )
     Plaintiff,               )
                              )
     v.                       )
                              )
THE BLACK & DECKER CORP.,     )    CIVIL ACTION
BLACK & DECKER, INC.,         )    NO. 04-10650 (AR Hearing)
BLACK & DECKER, U.S. INC.,    )    NO. 04-10672 (MS Hearing)
EMHART CORP., and EMHART      )    NO. 04-10671 (MS Hand/Arm)
INDUSTRIES, INC.,             )
                              )
     Defendants.              )
_____ )


MEMORANDUM AND ORDER
REGARDING SUMMARY JUDGMENT FOR
ARKANSAS HEARING LOSS, MISSISSIPPI HEARING LOSS,
AND MISSISSIPPI HAND/ARM VIBRATION
January 14, 2005

In this Memorandum, I address the question of summary

judgment related to purported cost-sharing agreements in the

defense of the Arkansas Hearing Loss, Mississippi Hearing Loss

and Mississippi Hand/Arm Vibration claims.  The question before

me is whether Liberty Mutual is obligated pursuant to such

agreements to compensate Black & Decker for various expenses

under Liberty Mutual insurance policies issued to Black & Decker

and its corporate predecessors.

-1-

## I. Background

### A.    Arkansas Hearing Loss (04-10650)

A number of employees or former employees of the Cooper Tire
& Rubber Company plant, in Texarkana, Arkansas, brought an action
in 1992 against a Black & Decker affiliate, Farrel, among others,
who were said to have manufactured equipment used in the Cooper
plant.  The plaintiffs alleged that the machinery was
unreasonably dangerous and defective, causing a loss of hearing
in each of them.  According to Black & Decker records, products
were provided to Cooper from 1963-1984.[1]

Although the claims relating to the defendants were
dismissed, Black & Decker seeks defense costs in the action.
Liberty Mutual has agreed to pay a share of these defense costs
pursuant to a purported cost-sharing agreement with Black &
Decker and other insurers involved in the underlying action.
Black & Decker contends that Liberty Mutual has not paid all that
it is required under the policies or the agreement, if any such
agreement is found to be enforceable.

---

[1]The defendants contend that these records of products sent
relate to Farrel.  The document referenced from their exhibits,
however, is titled "Emhart Supplied Machinery supplied to Cooper
Tire & Rubber Company".

### B.  Mississippi Hearing Loss (04-10672)

The allegations in the Mississippi Hearing Loss complaint are almost identical to those in the Arkansas Hearing Loss case. The plaintiffs were employees at the Ingalls Shipyard in Pascagoula, Mississippi.  As with the Arkansas claim, the claims relating to the defendants were dismissed without any payments being made, but Black & Decker seeks defense costs that were incurred.  Liberty Mutual again alleges that it has agreed to pay a share of these defense costs under an agreement with defendants and other insurers.  Black & Decker disputes that there is an enforceable cost-sharing agreement and argues that, in any event, Liberty Mutual has not paid all that is required under the policies or the agreement.

### C.  Mississippi Hand/Arm Vibration (04-10671)

The Mississippi Hand/Arm Vibration claim involves different injuries to employees of the Ingalls Shipyard.  Liberty Mutual contends that it made payments for defense costs pursuant to a cost-sharing agreement similar to the one in the Mississippi Hearing Loss claim, which Black & Decker disputes.

The parties request resolution of the question whether cost-sharing agreements existed and are enforceable as to each of these three claims.

## II. Standard of Review[2]

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995).  Once the movant has made such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue.  Id.

A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000), and a "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith

---

[2]Black & Decker contends that only it has moved for summary judgment with regard to these claims.  In its response, Liberty Mutual states that, "contrary to Black & Decker's assertion, Liberty Mutual is entitled to summary judgment with respect to the LTE claims, as has been described in previous pleadings, since there is no issue of material fact with respect to these claims."  Regardless of the formal posture of the claims previously, I will consider the parties' submissions as cross-motions for summary judgment.

v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).
"[C]onclusory allegations, improbable inferences, and unsupported
speculation," are insufficient to establish a genuine dispute of
fact.  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8
(1st Cir. 1990).

 Cross-motions for summary judgment do not alter the basic
summary judgment standard, but rather require courts to determine
whether either of the parties deserves judgment as a matter of
law on facts that are not disputed. See Adria Int'l Group, Inc.
v. Ferre Dev., Inc., 241 F.3d 103 (1st Cir. 2001); Wightman v.
Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).
Thus, in deciding cross-motions for summary judgment, courts must
consider each motion separately, drawing inferences against each
movant in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6
(1st Cir. 1997).

### III. Discussion

 The parties are in agreement that Maryland law will govern
the question whether there were enforceable cost-sharing
agreements in place to apportion responsibility for the defense
of these claims.  In Maryland, "[f]or a contract to be legally
enforceable, its language must not only be sufficiently definite
to clearly inform the parties to it of what they may be called
upon by its terms to do, but also must be sufficiently clear and
definite in order that the courts, which may be required to

-5-

enforce it, may be able to know the purpose and intention of the parties." Robinson v. Gardiner, 196 Md. 213, 217 (1950); see Mogavero v. Silverstein, 142 Md. App. 259, 272 (2002). Although the contract must be sufficiently definite, Maryland recognizes oral as well as written contracts. The Maryland Court of Appeals observed that "[a]n express contract has been defined as 'an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" County Commissioners of Caroline County v. J. Roland Dashiell & Sons, Inc., 358 Md. 83, 94 (2000) (quoting Black's Law Dictionary 323 (6th ed. 1990)).

Contracts also may be implied in fact when the contract is evidenced by the conduct of the parties. See Mass Transit Admin. v. Granite Construction Co., 57 Md. App. 766, 774 (1984). Implied in fact "'does not describe a legal relationship which differs from an express contract: only the mode of proof is different.'" Mogavero, 142 Md. App. at 277 (quoting Eaton v. Engelcke Manufacturing, Inc., 37 Wash. App. 677 (1984)). "A contract implied-in-fact relies on a 'mutual agreement or consent, and on the intention of the parties; and a meeting of the minds is required.'" Slick v. Reinecker, 154 Md.App. 312, 329 (2003) (quoting 17 C.J.S. Contracts § 6(b), at 422).

A.    (04-1-650) **Arkansas Hearing Loss**

Although Black & Decker now contends that the cost-sharing
agreements were never formalized,[3] it appears that it came to an
agreement with the insurers regarding the allocation of defense
costs regarding the Arkansas claim.  In fact, in its February
1998 memorandum in support of partial summary judgment, Black &
Decker -- in the Arkansas Hearing Loss section -- admitted that
it "and its insurers allocated defense costs pursuant to cost
sharing agreements, with each insurer paying in proportion to the
percentage of the exposure period for which it provided
coverage."  The summary judgment record before me contains other
indications, apart from this admission, that an agreement was
reached regarding Arkansas defense costs, including -- most
pertinently -- a letter from an Aetna representative outlining
the agreement that was cited by Black & Decker as evidence of
such an agreement in its February 1998 memorandum. (See 7/30/1992
Ladd Letter, Ex. E to Pl. Response to Supp. Mem. ("As I advised
you in my last letter we will be modifying the present cost

---

[3]Black & Decker does not make clear whether its arguments
regarding the existence of cost-sharing agreements apply to the
Arkansas claim.  Black & Decker simply contends in its
supplemental memorandum that "[a]s to the Arkansas claim, the
issue of cost sharing is irrelevant."  It did, however, in its
January 1999 supplemental submission, argue that Liberty Mutual
is responsible for the unpaid balance of other insurers.  I
assume for purposes of this discussion, therefore, that Black &
Decker believes that no enforceable cost-sharing agreement is in
place with regard to the Arkansas claim.

sharing agreement.").)  Moreover, attached to its January 1999 supplemental submission purporting to detail why the purported agreement is unenforceable is the affidavit of Mr. Clayton Roop, its Director of Corporate Risk Management.  In his affidavit, Mr. Roop concedes that "[d]uring the course of the Arkansas Hearing Loss Claim, there was an arrangement for payment of defense costs among Farrel's insurers that is set forth in a March 15, 1993 letter from Dolores Ladd of Aetna to Shirlann Shifflet of Black & Decker . . . ."  (Roop Aff., Ex. S to Defs. Supp. Mem.)

I find in brief that there was a meeting of the minds with regard to a cost-sharing agreement for the Arkansas Hearing Loss claim and that it was one supported by sufficient consideration, as I discuss in Section III.B.1 _infra_.  The remaining dispute centers around the proper arithmetic allocation of costs. Pursuant to the original agreement, Black & Decker's entire allocation was commensurate with policy years for which initially no insurance policies could be found.[4]  All of those policies have since been located and it is, consequently, possible to liquidate the amount Black & Decker is entitled to receive from Liberty Mutual pursuant to the agreement.  On the record before me, I conclude Liberty Mutual must reimburse Black & Decker for any reasonable costs Black & Decker demonstrates were incurred in

---

[4]As of March 15, 1993, this "undocumented" share equaled 27% of the defense costs.  (_See_ 3/15/1993 Ladd Letter, Ex. C. to Defs. Supp. Mem.)

connection with policy years for which coverage by Liberty Mutual
has now been established.

### B. Mississippi Hearing Loss

The current dispute regarding the existence of enforceable
agreements comes into sharpest focus in connection with the
defense of the Mississippi Hearing Loss (hereafter "Hearing
Loss") claim.  In its February 1998 memorandum for partial
summary judgment in the underlying case, Black & Decker stated
that it "paid a portion of the [Hearing Loss] defense costs,
pursuant to a cost sharing agreement comparable to that in the
Arkansas Hearing Loss claim.  For purposes of that agreement, the
exposure period was deemed to begin in 1964."  Black & Decker now
claims that the agreements are not enforceable.  It relies on
affidavits and depositions taken since its February 1998
submission.  The evidence it cites includes affirmations and
testimony by its own representatives, Mr. Sweeney, Mr. Kidwell,
and Mr. Roop, as well as a representative of Liberty Mutual, Mr.
Schlemmer.

Black & Decker's prior declarations that an agreement
existed in the Hearing Loss claim, however, are powerful evidence
to the contrary.  And its silence in the face of multiple
references to and apparent performance under the agreement also
raises concerns that Black & Decker only now disavows the
agreements because of some perceived change in circumstances in

-9-

this long litigation.  However, although this case presents an interesting and complicated factual scenario that provides Black & Decker a number of arguments, when looking at the overarching context, contract principles all point toward enforcement of the agreement.  Although no one principle may neatly capture all aspects of this context, principles such as judicial estoppel, equitable estoppel, acceptance by performance, and affirmation by silence are all implicated here, if not explicitly or clearly argued by the parties.

To be sure, Black & Decker's contention that it would not have agreed to a cost-sharing arrangement which would have made it responsible for the 1964-1970 policy years certainly is substantiated by the record.  Black & Decker has argued from the outset that it was covered during those years.  Its insistence, however, that this is evidence that a meeting of the minds with regard to a cost-sharing agreement never occurred is not persuasive.  Parties can agree that costs will be divided based on years of exposure and, in so agreeing, resolve a major uncertainty looming over the defense of the case.  The actual existence of certain policies and the proper responsibility for certain years may thereafter be established as evidence is developed and additional agreements are reached by the respective parties.

As an initial matter, the discussions between the parties

-10-

concerning the lost policies support the view that the parties had come to an agreement that costs would be allocated on a pro rata basis.  In his affidavit, Black & Decker's Mr. Kidwell contends that he would not have entered into the agreement so long as it prohibited reallocation.  That may be true, but he does not dispute that costs were to be allocated on a pro rata basis, and his description of the basis for disagreement between Black & Decker and Liberty Mutual would belie any attempt to do so:

> Mr. Schlemmer and I had conversations in which we disagreed concerning whether Liberty Mutual . . . had issued insurance policies to Black & Decker that provided coverage during the period 1964-July 1, 1970 (the initial portion of the exposure period pertinent to the claims asserted against Black & Decker in the Mississippi Hearing Loss Claim).  Mr. Schlemmer asserted that Liberty Mutual did not have copies of insurance policies that it issued to Black & Decker during the period 1964-July 1, 1970 and stated that Liberty Mutual would not pay <u>a percentage of the defense costs in the Mississippi Hearing Loss Claim that included said period</u>.  I advised Mr. Schlemmer that Black & Decker was certain that Liberty Mutual issued insurance policies to Black & Decker covering the period 1964-July 1, 1970 . . . that were applicable to the Mississippi Hearing Loss Claim and that Liberty Mutual was obligated to pay, <u>inter alia</u>, the defense costs <u>attributable to the period 1964-July 1, 1970</u>.

(Kidwell Aff. ¶ 5, Ex. J to Defs. Supp. Mem. (emphasis added).) In the absence of an agreement to allocate costs, there would be little need for this dispute in relation to defense costs.  As Black & Decker argues in relation to the question of consideration, Liberty Mutual's duty to defend -- in the absence

of a cost-sharing agreement -- extends to all defense costs.  The more detailed discussions regarding the specific allocation of defense costs only makes sense in the context where the parties having already agreed to allocate costs.

Moreover, in light of Black & Decker's subsequent actions in billing Liberty Mutual, it would not be a fair reading of the evidence to find that Black & Decker did not come to an enforceable agreement to allocate the costs of its defense in the Mississippi Hearing Loss Claim.  Evidence provided by Black & Decker demonstrates an understanding on its part that costs would be allocated.  For instance, Black & Decker offers a chart providing the alleged total unpaid balance under the purported agreement.  Liberty Mutual was billed for 37.5%, or $163,448.35, of the costs (consistent with the terms of the agreement) and is said to have paid $158,214.00.  This, despite Black & Decker's characterizations, is hardly evidence that agreement was not reached.  Moreover, it is difficult to see how the roughly $5,000 shortfall would constitute a substantial breach and, even if it were, how that permits Black & Decker to claim the contract is unenforceable rather than to enable it to seek damages.

Mr. Kidwell's deposition testimony also paints a picture of the parties agreeing to allocate costs but continuing to negotiate and disagree over the years for which each would be responsible:

-12-

Q: Do you agree or disagree with the statement that whatever
was attached as Exhibit I was a memorialization of a cost-
sharing agreement?

* * *

A: Yes.  I disagree that it was -- there were bits and
pieces of an overall agreement that had been agreed upon, so
there were certain terms that people were agreeable to, but
not an overall, all-encompassing cost-sharing agreement.

Q: As of November 3rd had an oral cost-sharing agreement
been entered into as to which there could be a written
memorialization?

A: Again, not an overall, all-encompassing cost-sharing
agreement.

* * *

Q: Is it correct that the main point of disagreement was the
disagreement regarding the document that is attached as
Exhibit 5 was the language of paragraph 9?

* * *

A: The answer is yes.

Q: What was there about the language of paragraph 9 that was
the point or a point of disagreement?

A: Well, as I pointed out in the previous answer, the
language is ambiguous, contradictory, but it doesn't set
forth what was <u>the whole issue between Black & Decker and
Liberty Mutual here, and that is either Liberty Mutual
agrees to pay for the '64 to '70 time period or if they will
not agree to it, that Black & Decker, while bearing those
expenses initially, will have a mechanism to try to recoup
those payments from Liberty Mutual, I believe.</u>

(Kidwell Dep., at 91-93, Ex. K to Defs. Supp. Mem. (emphasis

added).)  Contemporaneous correspondence corroborates the basic

understanding.  A letter, a courtesy copy of which Mr. Kidwell

received, written by Mr. Schlemmer on July 9, 1992 to Ms.

McCroddan, the Senior Claim Representative at ESIS, Black &

Decker's facilitator, also evidences an agreement to allocate

costs.  The lead paragraph reads:

In follow up to the establishment of a cost sharing agreement on the above captioned matter, I will be meeting with the insured at the end of this month to discuss further the unidentified periods of coverage the insured contends existed with Liberty Mutual.  Pending outcome of that meeting, it is my hope that we will be able to establish a firm period of coverage with Liberty Mutual for Black and Decker.

(7/9/1992 Schlemmer Letter, Ex. N. to Defs. Supp. Mem.)

Subsequently, Mr. Kidwell wrote a letter to Ms. McCroddan providing further evidence that the basic agreement as to allocation on a pro rata basis was not in dispute.  (See 8/6/1992 Kidwell Letter, Ex. M to Defs. Supp. Mem.)  Mr. Kidwell thanks Ms. McCroddan for the "revised Cost Sharing Agreement", and informs her that Black & Decker is "still negotiating with Liberty Mutual about the 1964-1970 period", but "[t]hat should not prevent us from meeting and attempting to work out an arrangement." (Id.)  Perhaps taken in isolation this letter might evidence negotiations only, but in light of the other evidence in the record, it further establishes that an a general agreement to allocate costs had been reached.

In January 1994, a representative of another insurer, Home Insurance Company, wrote a letter regarding the "Mississippi hearing loss litigation" to Mr. Roop at Black & Decker requesting that the allocations under the cost-sharing agreement be modified in light of the expiration of certain policies.  (1/6/1994 Home Ins. Co. Letter, Ex. T to Defs. Supp. Mem.)  "When the original

-14-

cost sharing agreement was set up, Home's share was 12.05 percent.  With the expiration of the two policies, Home's share should now be 4.17." (Id.)

And, as late as September 1994, representatives of Black & Decker received without subsequent protest courtesy copies of correspondence that referenced a cost-sharing agreement.  Mr. Gordon Clifford, Team Leader at ESIS, apprised a representative at Home that "[t]o date ESIS, Inc., on behalf of our client Black & Decker, has yet to receive reimbursement under the Cost Sharing Agreement, a copy of which is somewhere in the material that [a fellow Home representative] is forwarding to you." (9/13/1994 Clifford Letter, Ex. Y to Defs. Supp. Mem.)

Liberty Mutual directs attention to two additional pieces of documentary evidence.  The first is a letter written by Ms. McCroddan on June 18, 1993 in which she inquires of the parties to the agreement where the actual written agreement is located. It was being circulated and had not been seen after it reached the representative for Home Insurance Company.  Nevertheless, Ms. McCroddan informed the parties that "[a]ccording to our Cost Sharing Agreement, each carrier owes the following . . . ." (6/18/1993 McCroddan Letter, Ex. H to Pl. Response to Defs. Supp. Mem.)  Likewise, at the end of that year, Mr. Clifford of ESIS informed Black & Decker's Mr. Sweeney that the agreement had "never been fully executed" since it had never gotten beyond the

Home representative.  Nevertheless, the letter evidences an agreement that cost would be shared, even while noting that allocations may need to be adjusted.  (See 12/28/1993 Clifford Letter, Ex. I to Pl. Response to Defs. Supp. Mem. ("As you can see in my enclosed letter I broached upon the subject of revisiting the Cost Sharing Agreement due to changes in the contribution between Twin Cities and Home Insurance.")  The letter opens with "I'm enclosing a copy of the correspondence submitted to each of the participants in the Cost Sharing Agreement regarding the above litigation." (Id.)  Again, the parties apparently acted on the assumption that costs would be shared, while discussions continued regarding the precise allocation.  These discussions may be the reason the written agreement was not executed, but do not in themselves require a finding that the parties had not reached an enforceable agreement.

Of course, these communications do not stand alone.  There is also evidence, provided by Black & Decker itself and noted above, that Liberty Mutual was billed for only a percentage of the outstanding balance and, at the very least, substantially paid those bills.[5]  Consequently, I find that there is no real dispute of fact over the existence of an agreement regarding pro

---

[5]Liberty Mutual claims to have fulfilled its entire obligation.

rata allocation of defense costs in the Mississippi Hearing Loss
Claim.  This agreement is enforceable, despite never having been
formally memorialized in a separate writing.  Attorney Grievance
Commission of Maryland v. Culver, 371 Md. 265, 274-75 (2002)
(affirming the lower court's finding that an oral contract was
entered into based on evidence found in letters and in the
billing records).  The intention of the parties here is clear --
they agreed by words and actions to allocate costs on a pro rata
basis.

    1. Consideration

    Black & Decker, nevertheless, argues that any purported
agreement is not enforceable for lack of consideration.  Although
Black & Decker concedes that forbearance is generally sufficient
consideration, it contends that the situation here falls within
an exception to that general rule, relying on Snyder v. Cearfoss,
187 Md. 635, 643 (1947) and Jacobs v. Atlantco Limited
Partnership No. 1, 36 Md. App. 335 (1977).  In Snyder, the
Maryland Court of Appeals held that "forbearance to exercise a
legal right constitutes sufficient consideration for a contract,
although there is no express promise to forbear, if such
forbearance exists at the request of the party promising to
compensate for forbearance and in reliance upon such promise."
Snyder, 187 Md. at 644; see also B. Frank Joy Co. v. Isaac, 333
Md. 628, 642 (1994) ("Forbearance to exercise a right or pursue a

claim, or an agreement to forbear, constitutes sufficient consideration to support a promise or agreement."); Hieston v. National City Bank of Chicago, 104 A. 281, 283 (Md. 1918) ("The law is well settled in this state by a long line of authorities that the forbearance to institute legal proceedings is a good consideration for a promise by a third person to pay the debt of another, even though no actual benefit accrue to the party undertaking."). The Snyder court added, however, "that a mere promise not to prosecute a claim which is not founded in good faith gives no right of action of an agreement to pay for refraining from so acting, for a release from mere annoyance and unfounded litigation does not furnish valuable consideration." Id., 187 Md. at 643; see also Fiege v. Boehm, 210 Md. 352, 360 (1956). It is this latter category of purported unfounded claims into which Black & Decker asks this court to place Liberty Mutual's potential action. I decline to do so.

Maryland is a jurisdiction where "the tendency has been to make the test the honesty of the claimant, provided invalidity of the claim in law or in fact is not entirely obvious." 3 Williston on Contracts § 7:45 (4th ed. 2004) (citing Snyder). Moreover, "[i]t is immaterial whether the claim forborne is against the promisor or is a claim against a third person; the detriment to the promisee is the same, and it is not essential that there should be a benefit to the promisor." Id. (citing

<u>Hieston f. National City Bank</u>, 132 Md. 389 (1918)).

Black & Decker argues that Liberty Mutual could not pursue any claim in good faith because it had already admitted its duty to defend. In addition, it argues that the "purported agreement imposed no obligation on Liberty Mutual beyond paying the percentage of costs attributable to those policies." (Defs. Supp. Sub., at 6, Ex. A to Defs. Supp. Mem.) The Interim Cost Sharing Agreement for Mississippi Hearing Loss Litigation ("interim agreement"), (<u>see</u> Ex. Q to Defs. Supp. Mem., at 3), however, explicitly deals with this issue:

> WHEREAS, the parties to this Agreement disagree as to which, if any, of the insurance policies issued by the Carriers are applicable to and would include coverage for the various Hearing Loss Claims, and
>
> WHEREAS, all of the parties to this Agreement have differing positions on various questions of insurance coverage for Hearing Loss Claims and their respective rights and duties under insurance policies that were or allegedly were issued to Black & Decker, all of which positions are maintained in good faith, and
>
> WHEREAS, by this Agreement the parties intend to adopt, by way of compromise and accord and without prejudice to or waiver of their respective positions in this and other matters, a mechanism for allocating the responsibilities for defense costs and indemnity payments, with respect to pending Hearing Loss Claims for the life of this Agreement:
>
> NOW, THEREFORE, in consideration of the foregoing and of the mutual promises contained in this Agreement and intending to be legally bound, the Parties agree as follows . . .

Of course, the agreement in this written form was not formally executed, but the circulating draft does provide evidence of the parties' intentions. And, unlike the clause

-19-

relating to payments being final, there is no indication that this portion of the agreement was the obstacle to final execution of the interim agreement.  Black & Decker's contention, therefore, that Liberty Mutual was forbearing nothing is not accurate.  The record evidences a compromise between Black & Decker and its insurers.  Liberty Mutual gave up potential claims against other insurers in regard to the proper allocation of defense and indemnification costs.  Forbearance of claims against third parties -- though here Black & Decker was effectively a self-insurer itself under the original agreements -- may provide valid consideration.  See 3 Williston on Contracts § 7:45 (4th ed. 2004) ("It is immaterial if the claim forborne is against the promisor or is a claim against a third person; the detriment to the promisee is the same . . . .")  Such forbearance was at the very least a detriment to Liberty Mutual, while also serving to benefit Black & Decker.

On that point, Black & Decker's consideration arguments focus only on the purported detriment to Liberty Mutual.  Under general contract principles, however, valid consideration may also consist of a benefit to the promisor received at its request.  The dual nature of consideration has long been recognized in Maryland.  See Broaddus v. First Nat. Bank, 155 A. 309, 311 (Md. 1931) ("A great number of decisions have established the rule that a benefit to the promisor or a

detriment to the promisee is a sufficient consideration for a contract.  As stated in 6 R. C. L. 654, § 67: 'A valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other.'"); see also Cheek v. United Healthcare of Mid-Atlantic, Inc., 378 Md. 139, 147 (2003); 3 Williston on Contracts § 7:4 (4th ed. 2004) ("[T]he term benefit means the receiving as the exchange for a promise some performance or forbearance which the promisor was not previously entitled to receive.  That the promisor desired it for his own advantage and had no previous right to it is enough to show that it was beneficial.").  Although Black & Decker was potentially owed payment by the insurers pursuant to joint and several liability, it was not legally entitled to have an agreement among itself and its insurers to allocate costs and coordinate the defense.  By its words and actions, Black & Decker apparently desired and received just such coordination at the time.[6]

---

[6]As a final observation, I note the Restatement has abandoned the more formal benefit/burden paradigm, requiring only that there be evidence of a bargained-for exchange.  See Restatement (Second) of Contracts § 79(a) ("If the requirement of consideration is met, there is no additional requirement of (a) a gain . . . to the promisor or a loss . . . to the promisee . . . ."); Restatement of Contracts § 81 (noting that the "gain or advantage to the promisor or loss or disadvantage to the promisee . . . do not affect the sufficiency of consideration.").  I am

-21-

2. <u>Authority</u>

Black & Decker also claims that its representatives did not have authority to enter into a cost-sharing agreement on its behalf.  In Maryland, as elsewhere, "[t]he authority of an agent must come from the principal and can take the form of actual authority or apparent authority."  <u>Homa v. Friendly Mobile Manor, Inc.</u>, 612 A.2d 322, 359 (Md. App. 1992) (defining actual authority as "that which is actually granted by the principal" -- and may be express or implied -- and apparent authority as that which "is not actually granted by the principal, but the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it.")  With that said, an agent is not permitted to "enlarge the actual authority by his own acts without some measure of assent or acquiescence on the part of his principal . . . ." <u>Id.</u> at 360 (citing <u>Brager v. Levy</u>, 122 Md. 554, 561 (1914)).

The evidence of discussions regarding the negotiations between the parties -- in particular the deposition testimony of Black & Decker's Mr. Kidwell, <u>see</u> <u>supra</u> -- certainly establishes a facial basis for finding apparent authority.  As Williston explains:

---

satisfied, therefore, that both under traditional and more evolving interpretations of consideration, and in light of the overarching record in this case, that there was consideration for the agreement here.

-22-

> [A] corporation which, by its voluntary act, places an
> officer or agent in such a position or situation that
> persons of ordinary prudence, conversant with business
> usages and the nature of the particular business, are
> justified in assuming that the officer or agent has
> authority to perform the act in question and deal with him
> upon that assumption, is estopped as against such persons
> from denying the officer's or agent's authority.

12 Williston on Contracts § 35:69 (4th ed. 2004).

Black & Decker contends, however, that Mr. Kidwell, Mr.
Sweeney and Mr. Roop did not have actual authority to enter into
such an agreement on behalf of Black & Decker.  And in regard to
apparent authority, in his affidavit, Mr. Kidwell affirms that he
had no authority to enter into a cost-sharing agreement and made
that clear to a representative of Liberty Mutual.  In addition,
he claims that he made clear that any agreement would need to be
executed in writing.  (Kidwell Aff. ¶ 3-4, Ex. J to Supp. Mem.;
see Sweeney Aff. ¶ 8, Ex. X to Defs. Supp. Mem.)

I find a genuine dispute of fact regarding precisely what
authority each possessed and the extent to which they manifested
that to Liberty Mutual; but the scope of that dispute is not
material.  The contention that it was made explicitly clear to
Liberty Mutual that these individuals lacked authority to bind
Black & Decker relates to the finalization of the cost sharing
agreement given the persistent dispute regarding the lost policy
years.  In any event, while it certainly may be true that they
did not have authority -- actual or apparent -- to agree that

-23-

Black & Decker would be responsible for the lost policy years in allocating defense costs, this area of dispute does not overcome the evidence in the record that Black & Decker had already and continued to manifest -- through its action and inaction -- agreement to share costs on a pro rata basis.[7]  In short, there is no indication that Black & Decker then or now ever contested that it had agreed to allocate defense costs among itself and insurers.  Instead, it now attempts to obscure the nature of that meeting of the minds by arguing that the ongoing dispute over coverage during the lost policy years needed to be resolved, with the explicit authority of Black & Decker, before any enforceable agreement could be found.  I see no reason on the present record to find that to be the case.

    Black & Decker accepted partial payments, apparently billed at the percentages listed in the agreement.  (See Defs. Supp. Mem., at 9.)  In addition, despite documents it received referring to the agreement, it apparently never contested the existence of an agreement that costs would be shared based on exposure, reserving only an argument regarding what years it was self-insured, if any.  Only now, not having received

_____

    [7]Moreover, there is evidence that ESIS held itself out as Black & Decker's agent, acting on its behalf without any apparent dispute by Black & Decker at the time.  (See, e.g., 9/13/1994 Clifford Letter, Ex. Y to Defs. Supp. Mem.)  Although this authority may only have extended to the coordination of insurers' efforts, it is telling that Black & Decker apparently validated ESIS's efforts to allocate costs on a pro rata basis.

reimbursement of all its costs from all its insurers pursuant to the agreement does Black & Decker contend that no such enforceable agreement existed at all and that it may receive the entire outstanding balance from Liberty Mutual.

In sum, I find that Black & Decker entered into an enforceable agreement to allocate costs on a pro rata basis, evidenced by communications between the parties found in the record, its subsequent actions and silence. Liberty Mutual is therefore only responsible for its share of the defense costs under the cost-sharing agreement, determined by the years during which coverage has been established or conceded.

### 3. Repudiation

One final argument advanced by Black & Decker is that Liberty Mutual repudiated the agreement by bringing its declaratory judgment action in 1996. Black & Decker argues that due to the repudiation, and its own decision to abandon the agreement by bringing a counterclaim, the parties have been restored to the position they held before the purported agreements. The principle of repudiation, however, does not serve the purpose for which Black & Decker applies it. Williston summarizes the principle:

> Where one party to a contract expressly or by implication
> repudiates the contract before the time for his or her
> performance has arrived and before a default justifying the
> repudiation has occurred, the other party is relieved from

> performance on his or her side.  In other words, an
> anticipatory repudiation of contractual duties by one party
> to the contract excuses performance by the other.

13 Williston on Contracts § 39:37 (4th ed. 2004).

Black & Decker relies on a Maryland case that describes the principle in similar terms.  See Weiss v. Sheet Metal Fabricators Corp., 206 Md. 195, 203-04 (1955).  This is, however, a principle describing a form of breach on the part of one party and a defense to nonperformance by the other.  It is not, as Black & Decker would have it, a basis for finding the underlying agreement unenforceable, thereby permitting a party to recoup the entire outstanding balance on payments it contends it did not properly receive under the agreement, either by Liberty Mutual or other insurers.

In any event, Liberty Mutual's efforts to seek judicial determination of its obligations through a declaratory judgment action can be characterized as a breach only in the most strained sense.  Any even if it could meaningfully be termed a breach, such a breach would not serve to make the agreement itself retroactively unenforceable.

## C. Mississippi Hand/Arm Vibration

Although it appears that there was a great deal of overlap in personnel and organization between the defense of the Hearing Loss Claim and the Hand/Arm Vibration claims in Mississippi, the

-26-

record in support of an enforceable cost-sharing agreement for the latter case is considerably thinner. Liberty Mutual "maintains that any . . . participation [in the payment of defense costs] would be pursuant to the terms of the cost-sharing agreement in place with respect to the Mississippi Hearing Loss Claim." (Pl. Supp Sub., at 12, Ex. B to Pl. Response to Defs. Supp. Mem.) The evidence Liberty Mutual cites for this proposition, however, is the deposition testimony of its employee, Mr. Schlemmer. In that testimony, Mr. Schlemmer refers to "the general thought process of the Joint Defense Group" and states that his "recollection is that the gist of that discussion was the same coverage positions from the hearing loss will apply here . . . ." (Id. at 13.) However, there is no documentary evidence corroborating such an agreement.[8]

I recognize, however, that in the documentary evidence of these cases, a letter that helps establish the existence of an agreement for the Hearing Loss claim can be read to call into question the contention that a similar agreement had been reached for the Hand/Arm Vibration case. In a September 1994 letter, Mr. Clifford of ESIS concluded: "As to the cost sharing arrangement on the vibration claims if any, I am still waiting word from Black & Decker's corporate counsel, Miles & Stockbridge."

---

[8]I do also observe that Black & Decker noted the similarities between the Hand/Arm Vibration case and the Hearing Loss case in its February 1998 submission.

(9/13/1994 Clifford Letter, Ex. Y to Defs. Supp. Mem.)  Liberty
Mutual lumps the two claims together in its most recent
submission to the court, but all the evidence it cites predates
February 1994 and relates directly to the Hearing Loss claim
only.  And in response, Black & Decker contends that the evidence
in this case establishes the following:

> - There is no writing purporting to confirm an agreement
> concerning the Mississippi Hand/Arm Vibration Claim.
> - Mr. Sweeney did not discuss cost-sharing issues with Mr.
> Schlemmer, much less agree to the purported agreement
> concerning the Mississippi Hand/Arm Vibration Claim.
> - Neither Liberty Mutual nor any insurer made any payment
> for Black & Decker's defense costs in the Mississippi
> Hand/Arm Vibration Claim.

(Defs. Supp. Mem., at 5.).

To counter such arguments, Mr. Schlemmer's recollection of a
"general understanding" potentially could be corroborated by the
method of billing and payment for the Hand/Arm Vibration case.
Liberty Mutual claims to have made payments in defense of the
claim.  (See Pl. Response to Defs. Supp. Mem., at 2; see also id.
Ex. C, at 4 ("Liberty paid obligated amounts ($144,204)).  But
Black & Decker contests the point.  (See Defs. Supp. Sub., at 14,
Ex. A to Defs. Supp. Mem. (citing Mr. Roop's affidavit where he
said that "Black & Decker received no payments for defense costs
for the Mississippi Hand/Arm Vibration Claim from Liberty Mutual
or any insurer").)

-28-

### IV. Conclusion

For the foregoing reasons, I find Liberty Mutual is entitled to summary judgment establishing the existence of an enforceable cost-sharing agreement with regard to the Arkansas Hearing Loss and Mississippi Hearing Loss claims.  Black & Decker's motion for summary judgment as to those claims is DENIED.  The parties are directed to submit forms of judgment on or before January 28, 2005 reducing this determination to a declaration or an award of damages.

I decline to act upon summary judgment with regard to the Mississippi Hand/Arm Vibration claim pending further submissions on or before January 28, 2005 setting forth the facts and circumstances regarding what payments, if any, were made by Liberty Mutual on that claim.


_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE